# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

In re: ROBERT BRAWDERS; In re:
CHERYL BRAWDERS,

*Debtors,*

_____

ROBERT BRAWDERS; CHERYL
BRAWDERS,

*Appellants,*

v.

COUNTY OF VENTURA,

*Appellee.*

No. 05-55988

BAP No.
CC-04-01165-MoPK

OPINION

Appeal from the Ninth Circuit
Bankruptcy Appellate Panel
Klein, Perris, and Montali, Bankruptcy Judges, Presiding

Argued and Submitted
May 10, 2007—Pasadena, California

Filed September 11, 2007

Before: Andrew J. Kleinfeld and Richard A. Paez,
Circuit Judges, and William Hart,* Senior District Judge.

Opinion by Judge Paez;
Dissent by Judge Kleinfeld

_____

*The Honorable William Hart, Senior United States District Judge for
the Northern District of Illinois, sitting by designation.

12279

**COUNSEL**

Michael D. Kwasigorch, Simi Valley, California, for the debtors-appellants.

Noel A. Klebaum, County Counsel, and Donald O. Hurley, Assistant County Counsel, County of Ventura, California, for the defendant-appellee.

**OPINION**

PAEZ, Circuit Judge:

Robert and Cheryl Brawders ("the Brawders") appeal from a decision of the Bankruptcy Appellate Panel ("BAP") revers-

ing in part and remanding a bankruptcy court judgment which awarded them damages for the County of Ventura's ("County") violation of an automatic stay in the Brawders' prior Chapter 13 proceeding. The bankruptcy court had determined in a summary judgment ruling that the Chapter 13 Plan ("Plan") discharged the Brawders' liability for pre-petition property taxes owed the County, including the amount secured by a lien on the Brawders' real property. As a result of this ruling, the court's damages award included a refund for overpayments of pre-petition taxes in excess of the amount paid under the Plan. The BAP agreed that the County was liable for damages resulting from its violation of the automatic stay, but held that the Plan did not alter the County's lien rights to recover pre-petition taxes that remained unpaid. Therefore, the BAP held that the Brawders were not due a refund of the taxes paid in excess of the confirmed Plan amount.

We have jurisdiction under 28 U.S.C. § 158(d)(1), and we affirm.[1] We adopt as our own the BAP's thorough and well-reasoned opinion, 325 B.R. 405 (B.A.P. 9th Cir. 2005), attached as an Appendix. *See* Appendix *infra*. We further elaborate upon the facts of the case and address the effect of the parties' stipulation in the current Chapter 13 adversary proceeding on the County's right to enforce its lien to recover the pre-petition taxes that were not paid fully by the prior Plan payments. We conclude that, in light of the bankruptcy court's summary judgment ruling, the stipulation did not affect the County's right to recover pre-petition taxes.[2]

---

[1]We review *de novo* decisions of the BAP. *See In re CFLC, Inc.*, 166 F.3d 1012, 1015 (9th Cir. 1999). We independently review the bankruptcy court's rulings on appeal from the BAP, reviewing the bankruptcy court's conclusions of law de novo and its factual findings for clear error. *See id.*

[2]We note that the dissent agrees with us and with the BAP that the confirmed Plan affected only the Brawders' personal liability, not the County's lien for the pre-petition taxes owed, secured against the property. Dissent at 12313; *see also Johnson v. Home State Bank*, 501 U.S. 78, 84

## I.

The Brawders owned a house in Ventura County. They fell behind on their property tax, mortgage, and other payments, and, as a result, filed a Chapter 13 petition on February 8, 1995 in bankruptcy court in the Central District of California, No. ND 95-10521 RR. The Brawders proposed a Plan that identified the County as a Class Two creditor with a tax indebtedness secured by the Brawders' property. The Plan stated that the Brawders were in default to the County in the amount of $9,350, and proposed to repay the County $11,109.21, including interest, over a period of 60 months. The Plan provided that Class II Secured Creditors would retain their lien rights. The County received notice of the Plan by mail, but did not timely object.[3] Bankruptcy Judge Robin Riblet ordered the Plan confirmed on March 31, 1995.[4] As a result of the Plan confirmation, the automatic stay remained in effect. *See* 11 U.S.C. § 362(c)(1). The Chapter 13 Trustee made payments to the County pursuant to the Plan beginning April 28, 1995, and the County accepted them.

---

(1991) ("Even after the debtor's personal obligations have been extinguished, the mortgage holder still retains a 'right to payment' in the form of its right to the proceeds from the sale of the debtor's property. . . . [A] bankruptcy discharge extinguishes only one mode of enforcing a claim-namely, an action against the debtor in personam-while leaving intact another-namely, an action against the debtor in rem."). Thus, the dissent parts ways with the majority opinion only with respect to the effect of the stipulation.

[3]In September 1995, the County filed an untimely proof of claim for $20,264.32, which was later withdrawn. The County, through the declaration of a former employee in support of its summary judgment motion, presented evidence that the Brawders' Chapter 13 petition "failed to provide for any prepetition interest accrual whatsoever as to the taxes in arrears."

[4]The Brawders were discharged in accordance with the Plan on November 15, 2000.

In June 1997, the County violated the automatic stay by sending two notices, "Notice of Impending Tax Collector's Power to Sell" to the Brawders and GreenPoint Mortgage Funding, Inc. ("GreenPoint"), the holder of the first deed of trust on the Brawders' home. One was in the amount of $30,264.32 and the other, erroneously, in the amount of approximately six billion dollars. The Brawders contacted the County and were told to pay $1,622.20 in post-petition taxes. They did so.

In January 1998, GreenPoint contacted the office of the Chapter 13 Trustee and was advised that the only taxes remaining to be paid to the County via the Plan were in the amount of $4,273.01. The following month, Greenpoint issued a check for $26,380.88—the total unpaid taxes and interest claimed by the County less the amount due under the Plan.

GreenPoint then sought to foreclose on the Brawders' property to recoup the amount it paid the County.[5] It moved to have the automatic stay modified so that it could commence foreclosure proceedings. The Brawders and GreenPoint stipulated that the Brawders would pay GreenPoint the amount it paid to the County, but the Brawders later defaulted on the stipulation. GreenPoint again moved for relief from the automatic stay. Its request was granted in November 1999, and GreenPoint initiated foreclosure proceedings.

As a result, the Brawders filed a second Chapter 13 bankruptcy petition to stop the foreclosure sale on June 27, 2000 in the Central District of California, No. SV00-15661KL. The second plan was approved on December 11, 2000. In this bankruptcy proceeding, the Brawders filed an adversary complaint against both the County of Ventura Tax Collector and GreenPoint. In their second amended complaint, the Brawders

---

[5]Later, the County agreed to eliminate a portion of penalties and interests due, and refunded both GreenPoint and the Brawders certain funds.

alleged claims for: (1) declaratory relief and an accounting against GreenPoint and the County; (2) damages for violation of the automatic stay against GreenPoint and the County, for GreenPoint paying, and the County accepting payment on, the Brawders' past due property taxes; (2) injunctive relief and an order voiding the notice of default, notice of sale, and foreclosure sale by GreenPoint; (4) damages for the County's violation of the automatic stay by its issuing of the notices of tax sale and other acts demanding payments of pre-petition taxes; (5) damages for the County's maintenance of a fraudulent claim seeking overpayments; and (6) damages for abuse of process by the County.[6] The County moved for summary judgment. In support of its motion, the County argued that the confirmed Plan did not remove or alter its secured tax lien, *see* Cal. Rev. & T. Code § 2187, and therefore that it could properly initiate foreclosure proceedings to collect the balance of the pre-petition taxes owed.

The bankruptcy court ruled on the motion for summary judgment on April 8, 2002. It granted summary judgment in favor of the County on the second, fifth and sixth claims for relief, and—although the Brawders had not moved for summary judgment—granted summary judgment in favor of the Brawders on the fourth claim for violation of the automatic stay. In a corresponding "Memorandum on Legal Issue: The Effect of the Provision for the County's Claim and Lien Interest in the Plan Confirmed in Case No. ND 95-10521 RR," filed April 8, 2002, the court, in rejecting the County's legal argument, determined that the Plan, which had been confirmed without objection by the County, "provided for payment in full of the County's claim as a class 2 secured claim

---

[6]The Brawders ultimately paid GreenPoint, but reserved the dispute as to the actual amount due for resolution in an adversary proceeding. After the bankruptcy court granted summary judgment in favor of GreenPoint on one claim and found that the other claim against GreenPoint was moot, the Brawders and Greenpoint filed a stipulation for dismissal of GreenPoint from the proceeding.

of approximately $11,000." The court therefore concluded that "the County's pre-petition claim against the Debtors has been paid in full and the real property subject to said lien revested in the Debtors free of any lien interest held by the County on account of its pre-petition claims."

Following the court's order, in January 2003, the Brawders and the County entered into a "Stipulation Regarding Amount of Tax Refund and Interest Thereon Due to Plaintiffs" ("Stipulation"), which stated, in relevant part:

> 9.   On April 8, 2002, Judge Kathleen Lax issued an Order on Motion for Summary Judgment in which, as set forth in a separate Memorandum filed on the same date, she opined that upon completion of the Plan of Reorganization, the County's secured pre-petition real property taxes, were discharged as being considered "paid in full" and the lien thereon "revested in the Debtors free of any lien interest held by the County on account of its pre-petition claims."

> 10.   It is hereby agreed and stipulated by the parties that *the result of the foregoing court's ruling*, together with payments and refunds previously made as reflected in Cathy Caron's declaration, is that a refund of $12,905.86 is due to the plaintiffs by the County.

The bankruptcy court issued an order approving the Stipulation.

The remaining issue of damages was decided through a court trial. On April 30, 2003, the bankruptcy court issued a "Memorandum on Trial and Motion for Attorneys Fees and Costs," in which the court determined that the Brawders were entitled to damages of $39,668.21, including $12,905 for tax overpayments (as stipulated by the parties), interest on tax overpayments, compensation for excess costs incurred in the

refinance of the Brawders' home, attorneys' fees, and costs. Judgment was entered June 19, 2003.

Both parties appealed to the BAP.[7] The County argued that the bankruptcy court erred in determining that the Plan discharged all pre-petition taxes and interest owed the County, including through the lien against the property. The Brawders responded that: (1) the County's cross-appeal was untimely; (2) the Stipulation rendered the issues raised by the County moot; and (3) the bankruptcy court's ruling that the Plan discharged all pre-petition taxes and interest owed the County was proper.

In its opinion, the BAP determined that the County's appeal was timely and, in footnote 6, that the Stipulation did not render the issues raised by the County moot because it merely constituted an accounting of the amount due the Brawders, but did not address "in rem tax 'liability' issues." 325 B.R. at 409 n.6. It went on to conclude that the "[c]onfirmation of the Plan did not reduce the amount of Ventura's tax assessments or affect its lien rights." *Id.* at 417. The BAP therefore held that the County did not owe the Brawders a tax refund of $12,905, and remanded to the bankruptcy court to determine what, if any, damages were due the Brawders for the County's violation of the automatic stay. *Id.* The Brawders timely appealed.

## II.

We agree with the BAP that the County's stipulation that the Brawders were due a refund resolved only the "accounting" of the Brawders' personal obligations, and did not alter the County's right to enforce its secured tax lien against the property. *Id.* at 409 n.6. We believe that, in reaching the opposite conclusion, the dissent misreads the Stipulation and minimizes the contextual background.

---

[7]The Brawders' appeal was later dismissed for lack of prosecution.

**[1]** As indicated above, the bankruptcy court had determined on summary judgment that the County violated the automatic stay and was therefore liable for damages. The court's April 8, 2002 Memorandum on Legal Issue determined that the Plan "provided for payment in full of the County's claim" and that "the County's pre-petition claim against the Debtors has been paid in full and the real property subject to said lien revested in the Debtors free of any lien interest held by the County on account of its pre-petition claims." In light of the court's decision, all that remained for trial was the calculation of damages, including the amount due the Brawders for any payments they made for pre-petition taxes in excess of the $11,109.21 provided for in the Plan. The payments and refund amounts made by the parties were clearly documented, and the Stipulation therefore served to prevent the unnecessary litigation of undisputed facts at trial.[8]

**[2]** Thus, the County stipulated to the amount to be refunded to the Brawders for the purposes of an accounting based on the bankruptcy court's ruling regarding the amount due under the Plan. As the County consistently argued, both before and after it entered into the Stipulation, the Plan affected only the Brawders' personal obligations. We therefore conclude that the Stipulation addressed only the Brawders' personal liabilities. The Stipulation is unambiguous; nowhere in the Stipulation do the parties agree all pre-petition property taxes and interest secured by the County's lien against the Brawders' property were discharged—and we cannot read the Stipulation as providing for anything more.[9]

---

[8]In its Judgment and Order after Trial and on Motion for Attorney Fees and Costs, the bankruptcy court specifically referred to the Stipulation in determining, as part of its damages calculation, the refund due the Brawders.

[9]Although the County did not expressly state in the Stipulation that it reserved its appeal rights with respect to the bankruptcy court's legal determinations, it remained free to do so. The record reflects that the County consistently objected to the legal basis for the bankruptcy court's

*See Jeff D. v. Andrus*, 899 F.2d 753 (9th Cir. 1989) (stating that basic contract principles apply in interpreting stipulations (citing *Miller v. Fairchild Indus.*, 797 F.2d 727, 733 (9th Cir. 1986)); *In re Crow Winthrop Operating P'ship*, 241 F.3d 1121, 1124 (9th Cir. 2001) ("Under California law, if a contract's terms are unambiguous, a court may interpret the contract without recourse to extrinsic evidence."). We therefore conclude that the case is not moot, and that the BAP properly concluded that the County's lien rights were not affected by the Plan or the Stipulation.

**AFFIRMED**.

---

determination—that the Plan eliminated the County's ability to enforce its lien to collect the balance of the pre-petition debt—both prior and subsequent to its signing of the Stipulation. Thus, it would not make sense to read into the Stipulation an intent on the part of the County to adopt a position to which it remained in vigorous opposition.

**APPENDIX**

FILED
MAY 10 2005
HAROLD S. MARENUS, CLERK
U.S. BKCY. APP. PANEL
OF THE NINTH CIRCUIT

ORDERED PUBLISHED

# UNITED STATES BANKRUPTCY APPELLATE PANEL
# OF THE NINTH CIRCUIT

| | |
|---|---|
| In re: | ) BAP No. CC-04-1165-MoPK |
| | ) |
| ROBERT BRAWDERS and CHERYL BRAWDERS, | ) Bk. No.   SV-00-15661-KL |
| | ) |
| | ) Adv. No. SV-00-01370-KL |
| Debtors. | ) |
| | ) |
| | ) |
| COUNTY OF VENTURA TAX COLLECTOR, | ) |
| | ) |
| Appellant, | ) |
| | ) |
| v. | ) **O P I N I O N** |
| | ) |
| ROBERT BRAWDERS; CHERYL BRAWDERS, | ) |
| | ) |
| Appellees. | ) |

Argued and Submitted on January 20, 2005
at Pasadena, California

Filed — May 10, 2005

Appeal from the United States Bankruptcy Court
for the Central District of California
Honorable Kathleen T. Lax, Bankruptcy Judge, Presiding.

———————————

Before: MONTALI, PERRIS and KLEIN, Bankruptcy Judges.

MONTALI, Bankruptcy Judge:

In rare circumstances, the res judicata effect of a confirmed Chapter 13 plan can effectively avoid a creditor's lien or modify its in rem rights even if there is no valid legal basis for doing so, provided that the plan does so explicitly and due process considerations are met.[1]

Although the Chapter 13 plan in this case has language that clearly affects some secured creditors' rights, none of that language applies to the specific rights at issue here. Alternatively, even if the plan could be read to affect the secured creditor's rights, applying that strained reading in hindsight is no substitute for clear advance notice to the secured creditor, as required for due process. For each of these independent reasons, we REVERSE and REMAND a judgment awarding damages for violation of the automatic stay based on an erroneous interpretation of the effect of the confirmed plan.

## I.  FACTS

Debtors Robert and Cheryl Brawders ("Debtors") have a long standing dispute with the County of Ventura Tax Collector ("Ventura") over the amount of real property tax assessments on their principal residence (the "House"). Debtors claim that the amount due was reduced to $9,350.00 in an ear-

---

[1]Unless otherwise indicated, all chapter, section and rule references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1330, and to the Federal Rules of Bankruptcy Procedure, Rules 1001-9036.

We use the term "res judicata" in its generic sense — encompassing doctrines that have been more precisely called claim preclusion and issue preclusion as well as the codification in Section 1327 of the effect of confirmation. We use this broad terminology because there is some ambiguity about which doctrine Debtors rely upon and our reasoning applies to all such doctrines. *See generally Paine v. Griffin (In re Paine)*, 283 B.R. 33, 38-39 (9th Cir. BAP 2002) *and The Alary Corp. v. Sims (In re Associated Vintage Group, Inc.)*, 283 B.R. 549 (9th Cir. BAP 2002) (each discussing res judicata and collateral estoppel terminology).

lier Chapter 13 case (Case No. ND-95-10521-RR, Bankr. C.D. Cal.) (the "First Case"), filed on February 8, 1995. Now, in their current Chapter 13 case (SV-00-15661-KL) (the "Second Case"), Debtors seek damages for Ventura's attempt to collect a higher amount.

Ventura's collection attempt was to issue a "Notice of Impending Tax Collector's Power to Sell" on June 2, 1997, asserting $30,264.32 in past due taxes (the "Tax Lien Notice"). Ventura sent that notice after confirmation of Debtors' Chapter 13 plan in the First Case (the "Plan") but before the House had revested in Debtors. Ventura admits that sending the Tax Lien Notice violated the automatic stay, though it disputes whether this resulted in any damage to Debtors and it denies that the First Case had any effect on its lien rights or reduced the amount of its tax assessment.[2]

Ventura sent a copy of the Tax Lien Notice to Debtors' mortgage lender ("Bank"). Bank responded by making a payment to Ventura, without notice to Debtors, and then demanding reimbursement. This and other disputes with Bank precipitated Debtors' filing of this Second Case on June 14, 2000.

On June 27, 2000, Debtors filed an adversary proceeding against Ventura (SV-00-01370-KL). Bank was also named as a defendant but was later dismissed based on a consensual resolution involving refinancing the House and paying Bank. In their second amended complaint Debtors sought damages for issuance of the Tax Lien Notice, among other things.

---

[2]Under Debtors' Chapter 13 plan in the First Case the Property remained in the bankruptcy estate until Debtors received their discharge, which was not until November 15, 2000. *See* 11 U.S.C. § 1328(a). Section 362(c)(1) provides that, with some exceptions, "the stay of an act against property of the estate" continues "until such property is no longer property of the estate." 11 U.S.C. § 362(c)(1).

On Ventura's motion for summary judgment the bankruptcy court entered an order stating that Ventura had violated the automatic stay and leaving for trial an accounting and the amount of attorneys' fees and other damages to be awarded.[3] The bankruptcy court simultaneously entered a "Memorandum on Legal Issue: The Effect of the Provision for the County's Claim and Lien Interest in the Plan Confirmed in Case No. ND 95-10521 RR" (the "Res Judicata Decision") which determined that Debtors' House had revested in them "free of any lien interest held by [Ventura] on account of its prepetition claims" and that those claims had been reduced by the Plan to $9,350.00. There is no dispute that if Ventura's tax assessments are reduced to that amount then it was overpaid by Bank and Debtors, and Ventura will owe Debtors a refund of $12,905.00.

By a subsequent motion Debtors also sought to recover their expenses associated with refinancing their House to

---

[3]As noted in the text, the bankruptcy court's order was actually entered on Ventura's motion for summary judgment. The excerpts of record and the bankruptcy court's docket do not reflect any cross-motion for summary judgment by Debtors, but the bankruptcy court's order states "Fourth Cause of Action- (Violation of the Automatic Stay against County) [¶] *Grant in favor of the Plaintiffs [i.e. Debtors]*." (Emphasis added.) Debtors appear to assume that the bankruptcy court intended not merely to deny Ventura's motion for summary judgment but to grant affirmative relief to Debtors. They argue on this appeal that Ventura was bound to appeal this alleged ruling within ten days. *See* Fed. R. Bankr. P. 8002(a).

We reject Debtors' argument. Even if we were to assume that the bankruptcy court intended to grant affirmative relief to Debtors (and without suggesting that the bankruptcy court intended to do so or properly could do so), such a ruling would not be final because an accounting and a determination of damages remained for trial. *See generally Jensen Elec. Co. v. Moore, Caldwell, Rowland & Dodd, Inc.*, 873 F.2d 1327, 1329 (9th Cir. 1989) (order awarding attorney's fees which does not fully dispose of amount of fees is not a final, appealable order). *See also Lindblade v. Knupfer (In re Dyer)*, 322 F.3d 1178, 1186 n. 10 (9th Cir. 2003) (citing with approval authority that order establishing liability under § 362(h) but not quantifying damages is not final).

reimburse Bank for what it had paid to Ventura, the alleged cost of a higher interest rate for their refinance when the new lenders learned that the loan was in default, over $40,000.00 in attorneys' fees and costs, and pre-judgment interest. On June 19, 2003, the bankruptcy court issued a "Memorandum on Trial and Motion for Attorneys Fees and Costs" (the "Damages Decision") awarding $39,668.21 to Debtors, including the $12,905.00 for tax overpayments. The bankruptcy court entered a judgment, Debtor appealed,[4] and Ventura cross-appealed. Before us is the cross-appeal.

## II.  JURISDICTION

The bankruptcy court had jurisdiction under 28 U.S.C. § 1334 and 157. We have jurisdiction over this final judgment that determines the amount of damages for Ventura's violation of the automatic stay. 28 U.S.C. § 158(a) and (b). *See Dyer*, 322 F.3d at 1186 and n.10.[5]

---

[4]We dismissed debtors' appeal for lack of prosecution.

[5]Ventura argued before the bankruptcy court that there is no jurisdiction under Section 362(h) to award damages in this Second Case for a stay violation in the First Case. Ventura has not raised that argument on this appeal, and although we have an independent obligation to determine if we lack jurisdiction we are satisfied that the bankruptcy court did have jurisdiction to award such damages and therefore we have jurisdiction to review that award on appeal. This is not a case in which there are concurrent bankruptcy proceedings involving different debtors, where the actions of one bankruptcy court might impinge on the jurisdiction of the other, or violate principles of comity. *See, e.g.*, *Snavely v. Miller (In re Miller)*, 397 F.3d 726 (9th Cir. 2005) (citing inter alia *In re Shared Technologies Cellular, Inc.*, 293 B.R. 89 (D. Conn. 2003)). Rather, there is only one pending bankruptcy case involving the Debtors, who have asked the bankruptcy court to determine the res judicata effect of an order in a different case. Courts do this all the time. *See Valley Nat. Bank of Arizona v. A.E. Rouse & Co.*, 121 F.3d 1332, 1335-36 (9th Cir. 1997) (proper remedy if second court erred in not giving res judicata effect to first court's judgment is to appeal second court's determination, not collateral attack in third court). Moreover, these Debtors returned to the very same bankruptcy court (although a different bankruptcy judge). We have no difficulty in conclud-

## III. ISSUE

Did the bankruptcy court err in awarding damages, based on its conclusion that res judicata reduced the enforceable amount of Ventura's lien to the amount stated in Debtors' Plan?[6]

## IV. STANDARDS OF REVIEW

We review de novo the res judicata effect of a Chapter 13 plan and interpretation of the Bankruptcy Code and Rules, because these matters are legal issues or mixed questions of law and fact in which legal issues predominate. *George v. Morro Bay (In re George)*, 318 B.R. 729, 732-33 (9th Cir. BAP 2004); *Wells Fargo Bank v. Yett (In re Yett)*, 306 B.R. 287, 290 (9th Cir. BAP 2004). Interpretation of the contractual terms of a Chapter 13 plan is generally a factual issue

---

ing that the bankruptcy court in the Second Case had jurisdiction to determine the res judicata issues and decide whether to award damages under Section 362(h). *See Williams v. Levi (In re Williams)*, ___ B.R. ___, 2005 WL 857439 (9th Cir. BAP 2005) (ancillary jurisdiction in third bankruptcy case to annul stay in second bankruptcy case); 28 U.S.C. § 1367 (codification of supplemental jurisdiction).

[6]Debtors argue that this appeal is moot and frivolous because Ventura stipulated to what it owes Debtors in tax assessment overpayments (the "Tax Stipulation"). Debtors did not provide us with a copy of the Tax Stipulation until their motion to augment the record filed one week prior to oral argument before us, but the excerpts of record do include an order approving the Tax Stipulation and the Judgment does incorporate approximately the amount stipulated ($12,905.00, whereas the Tax Stipulation amount is $12,905.86). Nevertheless, having reviewed the Tax Stipulation we agree with Ventura that it resolves only the "accounting" and not the in rem tax "liability" issues. Therefore, this appeal is neither moot nor frivolous.

Debtors also allege that this appeal is untimely. As Ventura points out, the Res Judicata Order and the order approving the Tax Stipulation were both interlocutory. *See generally Jensen Elec. Co.*, 873 F.2d at 1329; *Dyer*, 322 F.3d at 1186 n.10. Debtors' notice of appeal from the Judgment extended the time for Ventura to file its notice of cross-appeal, and that notice was timely. *See* Fed. R. Bankr. P. 8002(a).

which we review for clear error (*Yett*, 306 B.R. at 290) but such factual issues can become mixed with legal issues. Whether a contract is ambiguous is a matter of law, which we review de novo. *Miller v. United States (In re Miller)*, 253 B.R. 455, 458 (Bankr. N.D. Cal. 2000) ("*Miller I*") (citing cases), *aff'd*, 284 B.R. 121 (N.D. Cal. 2002) ("*Miller II*").

In this case we need not decide which standard applies to interpretation of the Plan because we would reach the same result whether we reviewed the bankruptcy court's interpretation for clear error or de novo. Whether adequate notice has been given for purposes of due process in a particular instance is a mixed question of law and fact that we review de novo. *Educ. Credit Mgmt. Corp. v. Repp (In re Repp)*, 307 B.R. 144, 148 (9th Cir. BAP 2004).

## V.   DISCUSSION

There is no question that Ventura violated the automatic stay by sending the Tax Lien Notice. The question is what damages are appropriate, if any.

The bankruptcy court held Ventura partly responsible for Debtors' legal fees and the costs associated with resolving their disputes with Bank, including some of the costs of refinancing their House to repay Bank what it had paid Ventura. The bankruptcy court also awarded Debtors $12,905.00 based on its view that Ventura's lien had been reduced to $9,350.00 by the res judicata effect of the Plan and by Section 1327, which states in full:

> § 1327. *Effect of confirmation*
>
> (a) The provisions of a confirmed plan bind the debtor and each creditor, whether or not the claim of such creditor is provided for by the plan, and whether or not such creditor has objected to, has accepted, or has rejected the plan.

(b) Except as otherwise provided in the plan or the order confirming the plan, the confirmation of a plan vests all of the property of the estate in the debtor.

(c) Except as otherwise provided in the plan or in the order confirming the plan, the property vesting in the debtor under subsection (b) of this section is free and clear of any claim or interest of any creditor provided for by the plan.

11 U.S.C. § 1327.

It is well established that principles of res judicata and finality, as partly codified in Section 1327, can make even "illegal" provisions of a Chapter 13 plan binding. *See Great Lakes Higher Educ. Corp. v. Pardee (In re Pardee)*, 193 F.3d 1083 (9th Cir. 1999) (student loan debt discharged by confirmation of Chapter 13 plan so providing, even though debt may have been nondischargeable); *Multnomah County v. Ivory (In re Ivory)*, 70 F.3d 73 (9th Cir. 1995) (res judicata precluded collateral attack on confirmation order, despite possible jurisdictional error).[7]

This general proposition is subject to some major limitations. The starting point is that a debtor asserting res judicata "has the burden of proof on all elements and bears the risk of non-persuasion." *Repp*, 307 B.R. at 148 n.3 (citations omitted).

Next, a plan should clearly state its intended effect on a given issue. Where it fails to do so it may have no res judicata effect for a variety of reasons: any ambiguity is interpreted against the debtor, any ambiguity may also reflect that the court that originally confirmed the plan did not make any final determination of the matter at issue, and claim preclusion gen-

---

[7]These concepts are more fully explicated in *Associated Vintage Group*, 283 B.R. 549, 554-65.

erally does not apply to a "claim" that was not within the parties' expectations of what was being litigated, nor where it would be plainly inconsistent with the fair and equitable implementation of a statutory or constitutional scheme. *See Miller I*, 253 B.R. at 456-59, *aff'd*, *Miller II*, 284 B.R. at 124; *Repp*, 307 B.R. at 148 n.3; *Associated Vintage Group*, 283 B.R. at 554-65.

Another major limitation is that due process requires adequate notice and procedures. *See, e.g.*, *Repp*, 307 B.R. at 149-54 (notice requirements); *Enewally v. Wash. Mutual Bank (In re Enewally)*, 368 F.3d 1165, 1173 (9th Cir.), *cert. denied*, 125 S.Ct. 669 (2004) (confirmation has no preclusive effect on matters requiring adversary proceeding, or where plan does not give adequate notice of proposed treatment).

The foregoing limitations on res judicata principles are particularly apropos when secured claims are involved. Absent some action by the representative of the bankruptcy estate, liens ordinarily pass through bankruptcy unaffected, regardless whether the creditor holding that lien ignores the bankruptcy case, or files an unsecured claim when it meant to file a secured claim, or files an untimely claim after the bar date has passed. *See Bisch v. United States (In re Bisch)*, 159 B.R. 546, 550 (9th Cir. BAP 1993) ("there is no duty on the part of the secured party to object to the confirmation of the [Chapter 13] plan, and failure to do so does not somehow constitute a waiver of the party's secured claim"); *Work v. County of Douglas (In re Work)*, 58 B.R. 868, 869 (Bankr. D. Or. 1986). *See also Enewally*, 368 F.3d at 1168-72 and n.2 (noting implications of "Fifth Amendment's prohibition against taking private property without compensation") (citation and quotations marks omitted). There is no dispute that Ventura's assessments are secured by a lien because California law provided as of the filing date of the Second Case that "[e]very tax on real property is a lien against the property assessed." Cal. Rev. & Tax. Code § 2187 (West 1998).

Applying the above principles to this case, Debtors have not met their burden to establish that their Plan had any res judicata effect on Ventura's lien rights or the amount of its assessments.

   a.   *The Plan only purports to affect Ventura's claim against the estate, not the amount of the underlying assessment debt or Ventura's in rem rights*

The Plan is a stationer's form with blanks filled in by Debtors. Debtors rely on form language stating that the present value of distributions under the Plan on account of secured claims "is equal to the allowed amount of such claim." Debtors take this language out of context. The full provision states:

   III.   *CLASSIFICATION AND TREATMENT OF CLAIMS*

   \* \* \*

   2.   *CLASS TWO* -- Claims secured by Real Property that is the debtor's PRINCIPAL RESIDENCE. The value as of the effective date of the Plan, of the series of payments to be distributed under the Plan on account of each secured claim provided for by the Plan, *is equal to the allowed amount of such claim.* Defaults shall be cured using a discount rate of __7__ % per annum. Any obligation maturing by its terms before termination of this Plan shall be paid on or before its due date. *Each creditor shall retain its lien.* [Emphasis added.]

| | *Amount in Default* | Monthly Payment | Number of Months | Total Payment |
|---|---|---|---|---|
| National Mortgage Co. | *$4,244* | $84.04 | #60 | $5,042.62 |

   \* \* \*

| | | | |
|---|---|---|---|
| [Ventura] | *$9,350* | $185.15 #60 | $11,109.21 |

[Emphasis added.]

The above provision is geared toward typical debtors who may have fallen behind in mortgage payments on their principal residence. Debtors' treatment of National Mortgage Co. ("National") illustrates how this provision works.

At oral argument we confirmed that National is the holder of a consensual mortgage or deed of trust debt against Debtors' House and that the $4,244.00 listed is the arrearage amount, not the total amount of the debt. Under the Plan, Debtors' $4,244.00 of arrearages were to be repaid to National over the term of the Plan but, as Debtors' attorney confirmed, the Plan does not purport to reduce the underlying mortgage debt owed to National, nor does the Plan affect National's rights to enforce its lien in that total amount upon any default. Therefore, when the Plan states that its distributions to class two (the distributions on the "amount in default") will be equal in value to the allowed amount of the creditor's "claim," it is using common Chapter 13 parlance to refer to the arrearage *not* the total amount of the debt.

Debtors read the word "claim" as referring to the underlying debt, and they read the Plan as reducing that debt to the "amount in default" listed in class two; but if that were so then Debtors' entire mortgage debt (perhaps several hundred thousand dollars) would be reduced to the amount in default ($4,244.00). Not only is that a very strained reading but it would be prohibited by the Bankruptcy Code, which generally bars any modification of the rights of creditors holding claims "secured only by a security interest in real property that is the debtor's principal residence" (except to cure defaults over a reasonable time). *See* 11 U.S.C. § 1322(b)(2), (b)(5), and (c). It would be inconsistent to read the Plan's boilerplate language to modify precisely the types of claims that cannot be modified.

At oral argument Debtors' attorney argued that the outcome should be different for Ventura because it is not a consensual lender. We are not persuaded. It is true that the antimodification provisions of Section 1322(b)(2) apply only to consensual liens (*see* 11 U.S.C. §§ 101(51) and 1322(b)(2)), but the meaning of the Plan does not change based on the character of the debt. Debtors cannot read the same language in class two one way for National and another way for Ventura.

Debtors' attorney also argued that tax debts typically are equal to the entire amount of the underlying tax, implying that Ventura should have known that what was being modified was the underlying debt, not just what it was to receive out of Chapter 13 Plan payments. The fact that the underlying debt to Ventura may equal or approximate any arrearage has nothing to do with whether the Plan purports to affect the underlying debt or the lien securing that debt.[8] All that the Plan did was to limit what Ventura would be paid from the bankruptcy estate. It did not purport to affect the underlying assessment debt to Ventura or its in rem rights.

Debtors' reading is also out of context with the rest of the Plan. Included in the Plan is a motion to avoid creditors' liens that impair exemptions. *See* 11 U.S.C. § 522(f). It clearly warns that Debtors intend "to treat such creditors as unsecured creditors only" and that any objection must be filed "*within 20 days from the date this motion and plan is served on you*." [Emphasis in original.] There is no similar notice, or any notice at all, to warn creditors in class two of Debtors' interpretation of the Plan as effectively stripping liens down to the amount of arrearages.

Another provision of the Plan actually does propose to strip liens to the alleged value of the collateral, but it gives clear

---

[8]In fact, the total amount of property tax debt may be different from the "amount in default" that is placed in class two of the Plan. Taxes can be assessed but not yet "in default."

notice that this is what is intended. *See* 11 U.S.C. § 506(a). It specifies the precise dollar amounts for the "total amount of debt," the "secured claim," and the "unsecured amount." In contrast, the Plan's provision concerning class two does not mention the total amount of debt, it refers only to the "[a]mount in default," and it provides that "[e]ach creditor shall retain its lien."

These differences illustrate once again that the class two portion of the Plan concerns arrearages, not the total amount of the underlying debt or the lien securing that debt. Debtors have not met their burden to establish that the Plan purported to have any effect on the amount of Ventura's tax assessment or its lien rights. *See generally Miller I*, 253 B.R. 455, *aff'd Miller II*, 284 B.R. 121 (refusing to apply ambiguous plan provision against creditor under res judicata principles).

> b. *Alternatively, applying any reading of the Plan that would affect the underlying debt to Ventura or its lien rights would violate due process*

Even if the Plan could be read as Debtors suggest, that meaning is hardly clear enough to have given Ventura adequate notice in the First Case to satisfy due process. Debtors did not combine confirmation of their Plan with an adversary proceeding seeking a declaratory judgment or partial lien avoidance limiting Ventura's in rem rights, nor did the Plan give notice that Debtors had any such intent. *See* Fed. R. Bankr. P. 3007 (claims objections) and 7001(1), (2), and (9) (adversary proceeding required for avoidance of lien, or determination of its "validity, priority, or extent," or declaratory judgment of same).

As the Ninth Circuit stated in *Enewally*:

> Although confirmed plans are res judicata to issues therein, *the confirmed plan has no preclusive effect*

*on issues that must be brought by an adversary proceeding, or were not sufficiently evidenced in a plan to provide adequate notice* to the creditor.

&ast; &ast; &ast;

"[I]f an issue must be raised through an adversary proceeding it is not part of the confirmation process and, unless it is actually litigated, confirmation will not have a preclusive effect." *Cen-Pen Corp. v. Hanson*, 58 F.3d 89, 93 (4th Cir. 1995) (quoting *In re Beard*, 112 B.R. 951, 956 (Bankr. N.D. Ind. 1990)).

*Enewally*, 368 F.3d at 1173 (emphasis added). *See also Shook v. CBIC (In re Shook)*, 278 B.R. 815, 824 (9th Cir. BAP 2002) (plan can effectively determine value and/or avoid a lien only if creditor receives "clear notice" that the plan will do so).

Debtors argue that the order confirming the Plan states, "The court finds that the plan meets the requirements of 11 U.S.C. § 1325," implying that such requirements were "actually litigated." Section 1325 provides that, unless collateral is surrendered or the holders of allowed secured claims agree otherwise, they must retain their liens and the value of distributions under the Chapter 13 plan must be "not less than the allowed amount of such claim." 11 U.S.C. § 1325(a)(5).

If this is Debtors' argument it misreads *Enewally*. Nothing in the excerpts of record suggests that as part of their Plan confirmation process Debtors submitted evidence for what amounts to a declaratory judgment that the tax assessments were only $9,350.00. Nor is there any evidence that Ventura had adequate notice that this was at issue and that Debtors would treat confirmation as the equivalent of an adversary proceeding. *See Repp*, 307 B.R. at 152-53 (creditor entitled to expect that adversary proceeding rules will be applied when required).

An adversary proceeding is commenced by the filing of a complaint and service of a summons and the complaint on the defendant. Fed. R. Bankr. P. 7003 and 7004. Thus, the creditor is specifically put on notice that the validity of its lien is at issue and that it must respond in order to preserve its rights.

If the process contemplated by the applicable rules is not followed, a creditor's rights can be affected only if the requirements of due process are otherwise met. *See GMAC Mortgage Corp. v. Salisbury (In re Loloee)*, 241 B.R. 655, 662 (9th Cir. BAP 1999) (the greater the deviation from the process set out in the rules, "the greater the quality and amount of notice needed in order to comply with due process").

As we have held in an analogous Chapter 11 case involving claim objections under Rule 3007:

> Neither the statute nor the rules say, "oh, by the way, we [plan proponents] can also sandbag you by sneaking an objection into a reorganization plan and hoping you do not realize that we can use this device to circumvent the claim objection procedure mandated by the rules." That is not the law, and if it were the law, it would be a material disservice to public confidence in the integrity of the bankruptcy system.

> While we do not hold that a plan can never be used to object to a claim of a creditor who does not actually consent to such an objection, by holding that the essence of Rule 3007 must be complied with, we are holding that *considerations of due process mandate great caution and require that the creditor receive specific notice (not buried in a disclosure statement or plan provision) of at least the quality of specificity, and be afforded the same opportunity to litigate one-on-one, as would be provided with a straightforward claim objection under Rule 3007.*

*Varela v. Dynamic Brokers, Inc. (In re Dynamic Brokers, Inc.)*, 293 B.R. 489, 497 (9th Cir. BAP 2003) (emphasis added). *See also In re Millspaugh*, 302 B.R. 90, 100 at nn.20-21 (Bankr. D. Idaho 2003) (applying *Dynamic Brokers* in Chapter 13 context).

At oral argument both counsel suggested that the bankruptcy court in this Second Case was concerned about Ventura being permitted to ignore the First Case and still pursue its in rem remedies at some later date. That concern reverses the parties' burdens. It was Debtors' burden to bring an action for declaratory relief as to the amount of taxes owed, or to avoid Ventura's lien or otherwise limit its in rem rights. We have already held that the Plan did not even purport to do this; but assuming for the sake of argument that the Plan could be read as Debtors suggest, that reading is too obscure to satisfy Ventura's due process rights. Therefore the Plan has no res judicata effect on the amount or enforceability of Ventura's lien against Debtors' real property.

This does not mean that Ventura was entitled to receive payments from the bankruptcy estate greater than what was provided in the Plan. Ventura did not file a timely proof of claim in the First Case and it withdrew its untimely claim, so the only Chapter 13 payments to which Ventura was entitled were those that Debtors provided in the Plan — $9,350.00 over time, with interest. In addition, though, Ventura retained its in rem rights against Debtors' House, and those rights and the amount of the underlying debt owed to Ventura have not been affected by confirmation of Debtors' Plan in the First Case. Ventura was also entitled to accept payments from Bank (which undoubtedly paid Ventura to protect its security interest from being eroded by the penalties and interest that might accrue if Ventura continued to remain unpaid).

Our conclusions are consistent with the authority cited by the bankruptcy court and by Debtors. The bankruptcy court cited *Andrews v. Loheit (In re Andrews)*, 49 F.3d 1404 (9th

Cir. 1995), and *Work*, 58 B.R. 868, for the proposition that the "treatment provided in the Plan was consistent with 11 U.S.C. § 1325(a)(5)(B)." As noted above, that section of the Bankruptcy Code generally requires that secured creditors receive the present value of their allowed claim over time. *See* 11 U.S.C. § 1325(a)(5)(A) and (B).

It is true that Ventura waived any rights under Section 1325(a)(5) by not asserting a claim or objecting to the Plan. Out of the Plan payments Ventura was entitled to no more than what the Plan provided. *See Andrews*, 49 F.3d at 1409. That does not, however, eviscerate Ventura's lien rights or reduce the total amount of assessments secured by its lien. Section 1325(a)(5) is irrelevant to our analysis.

The reasoning in *Work* supports our analysis. Section 1327(c), on which Debtors' rely, says that confirmation of a Chapter 13 plan vests property of the estate in the debtor "free and clear of any claim or interest" of a creditor provided for in the plan. As *Work* observed, claims and interests are not the same thing. "Claim" is defined in § 101(5), and includes a "right to payment" or "right to an equitable remedy." 11 U.S.C. § 101(5). "Interest" is not defined in the Bankruptcy Code, but must mean something different from "claim."

> If, for the purposes of § 1327(c), the term "claim" was meant not only to include claims against the debtor but also claims against property of the debtor, then use of the term "interest" would be superfluous. By use of the term "interest" it appears that the term "claim" was to have a more limited meaning than that used in § 102(2).[9] It is appropriate that the Court determine in factual circumstances such as in

---

[9]Section 102(2) provides that " 'claim against the debtor' includes claim against property of the debtor[.]" 11 U.S.C. § 102(2). Therefore, although Ventura's ad valorem taxes are not Debtors' personal liability they are still a claim against the bankruptcy estate.

> the present case, that the term "claim" include those debts upon which the debtor has personal liability and the term "interest" cover claims against property of the debtor. The term "claim" would refer to debts which would be discharged under § 1328 and the term "interest" would refer to liens or interests in property which would be unaffected by a discharge under § 1328.

*Work*, 58 B.R. at 871.

Under this reasoning, a plan that provides for a claim but does not provide for an interest in property securing that claim does not affect the interest of the creditor in the property. The property vests free of the claim, but not free of the interest, which in this case is the lien of Ventura.

On this appeal Debtors also cite *Lawrence Tractor Co. v. Gregory (In re Gregory)*, 705 F.2d 1118 (9th Cir. 1983), and *Ivory*, 70 F.3d 73. Neither case is contrary to our analysis.

In *Gregory* the Ninth Circuit held that the holder of "a large, *unsecured* claim" receives adequate notice for purposes of due process when it receives "any notice from the bankruptcy court that its debtor has initiated bankruptcy proceedings" because "it is under constructive or inquiry notice that its claim may be affected, and it ignores the proceedings to which the notice refers at its peril." *Gregory*, 705 F.2d at 1123 (emphasis added). The Ninth Circuit's specific reference to an unsecured claim is important. Unsecured claims invariably are affected by bankruptcy. In contrast, as we have noted, in rem rights generally pass through bankruptcy unaffected. Therefore, unlike unsecured creditors, secured creditors may ignore the bankruptcy proceedings and look to the lien for satisfaction of the debt. *Work*, 58 B.R. at 869.

In *Ivory*, the Ninth Circuit held that even if the bankruptcy court had been in error by permitting the debtor to redeem

property after the redemption period had expired, res judicata precluded the creditor from bringing what amounted to a collateral challenge to the confirmation order. *Ivory*, 70 F.3d at 74-75. This was so, the court held, even if the bankruptcy court's error was jurisdictional. *Id.* at 75.

*Ivory* is inapposite because the issue determined by res judicata was the redemption period, not a purported reduction of a secured claim that would otherwise pass through bankruptcy unaffected. There is no discussion in *Ivory* of due process, and the decision says nothing about what notice the county in that case received or how that Chapter 13 plan was worded. Most tellingly, the plan in *Ivory* purported to affect the creditor's rights whereas here the Plan does not purport to affect Ventura's lien or determine the proper amount of Ventura's assessments under applicable law.

As stated by the Ninth Circuit in a Chapter 11 case:

> If [the debtor] intended [the amount of the creditor's claim stated in a Chapter 11 plan] as a means of challenging the amount of [the creditor's] claim, he picked a peculiar way of going about it, hardly consistent with his fiduciary obligations to a creditor of the estate. While the debtor may challenge any claim he believes in good faith should not be allowed, he must do so by raising the issue squarely with the court and giving the affected creditor an opportunity to respond.

*Everett v. Perez (In re Perez)*, 30 F.3d 1209, 1215 (9th Cir. 1994) (citation and footnote omitted).

In this case, if Debtors intended the Plan to reduce the amount of Ventura's tax assessments or affect its rights to enforce the full amount of its lien, they needed to raise these issues squarely with the court and Ventura. The need for clear notice is especially high in cases like this because a plan can

be confirmed very quickly in a Chapter 13 case — as little as 30 days in local practice, according to Ventura. *See* Fed. R. Bankr. P. 3015(b) (Chapter 13 plan may be filed with petition) and 2002(b) (25 days' notice by mail of time fixed for filing objections and hearing to consider confirmation of Chapter 13 plan). No strained reading of the Plan can amount to the clear notice and procedural protections to which Ventura would have been entitled if Debtors had properly sought relief under the Bankruptcy Code and Rules.

For the foregoing reasons, we disagree with Debtors' reading of the Plan and its alleged res judicata effect. Confirmation of the Plan did not reduce the amount of Ventura's tax assessments or affect its lien rights.

Ventura claims that all of the damages flow from the res judicata issue. We agree with Ventura that the underlying debt was not reduced to $9,350.00 by any res judicata effect, so Ventura does not owe Debtors a refund of $12,905.00, but it is less clear how Debtors' other damage claims might be affected. On remand the bankruptcy court can determine whether in view of our reversal on the res judicata issue Debtors are entitled to any portion of the damages previously awarded.

## VI. CONCLUSION

Debtors argue that the res judicata effect of their confirmed Plan reduced the amount of Ventura's tax assessments to $9,350.00 and revested their House in them free and clear of Ventura's lien in any greater amount. Nothing in the Plan, however, purports to affect Ventura's lien rights or act as a declaratory judgment on the proper amount of tax assessments.

Alternatively, even if the Plan could be read as Debtors now propose, Ventura did not receive the clear notice and procedural protections that due process requires. If Debtors

wanted what amounts to a declaratory judgment as to the proper amount of tax assessments, or a partial avoidance of Ventura's lien, they should have filed an adversary proceeding.

For each of these alternative reasons, the res judicata effect of the Plan did nothing to reduce the amount of Ventura's underlying tax assessments or affect Ventura's lien rights. Any award of damages for violation of the automatic stay must be reconsidered in light of these conclusions.

Accordingly, we REVERSE and REMAND.

KLEINFELD, Circuit Judge, dissenting:

I respectfully dissent.

Mr. and Mrs. Brawders filed a Chapter 13 bankruptcy in 1995. They had a disagreement with the County of Ventura about how much real property tax they owed on their home. In their plan, filed in February 1995, they listed the County as a creditor for $9,350 in default, and a total of $11,109.21. The Bankruptcy Court confirmed the plan and the monthly payment thereunder in November of 2000, without objection from the County. The County filed no proof of claim, made no objection, and accepted the Brawderses' payments under the plan.

But while the 1995 bankruptcy was pending and the automatic stay under section 362 was in effect, the County sent the Brawderses a "notice of impending tax collector's power to sell." The notice said the Brawderses owed $3,254 in taxes past due, requiring $6.1 billion to redeem. The County then sent another notice, that said the Brawderses owed $3,254 in taxes past due, requiring $27,010 to redeem. Evidently, the County had some sort of difficulty with its bookkeeping and notice printing, which throws light on why a stipulation was needed to settle the amount. The mortgage company for the Brawderses' house protected its interest by paying the County what the County eventually settled upon as the amount due, and initiated foreclosure.

The Brawderses then filed a second bankruptcy case, to stop the foreclosure. They sought damages from the County and the mortgage company for violation of the automatic stay and a declaratory judgment to establish the amount of taxes owed. The County moved for summary judgment.

Subsequently, the Brawderses refinanced their house and settled their dispute with their mortgage company. And more importantly for this appeal, they settled their dispute with the

County. On January 3, 2003, the County's attorney filed a stipulation in Bankruptcy Court on County Counsel's stationary, signed by both sides. The stipulation recites that the County was overpaid for the back taxes and had made refunds, but acknowledged that the refunds were insufficient in light of the Bankruptcy Court's order holding that the prepetition taxes had been paid in full. Accordingly, the County and the Brawderses "agreed and stipulated . . . that a refund of $12,905.86 is due to the plaintiffs by the County," plus interest from June 1, 2000. The bankruptcy court entered an order, lodged by County Counsel, accepting the stipulation as "binding upon the parties for purpose of these proceedings."

Nevertheless, the County claimed in trial that the amount it had settled upon was erroneous and that it was owed more. (The County had acknowledged in its summary judgment motion that it had made errors in calculating the Brawderses' property taxes, but claimed that it had corrected its errors and now knew what they owed.) The Bankruptcy Court found that the County had willfully violated the automatic stay by issuing a notice of tax sale, and awarded damages and attorneys' fees. The Bankruptcy Court had held, in granting partial summary judgment, that because the plan in the 1995 bankruptcy had been confirmed without objection, stating the amount and giving notice to the County, and that amount had been paid in full, the Brawderses' house "revested in the Debtors free and clear of any lien of the County on account of all prepetition taxes." Judgment was in favor of the Brawderses as against the County for a little under $40,000, mostly for what they had to spend to refinance their house to avoid foreclosure, and in part for legal fees.

The Brawderses appealed (the award was smaller than they had sought) and the County cross-appealed. The Brawderses' appeal was dismissed for failure to prosecute, so the Bankruptcy Appellate Panel decided only the County's appeal. The County conceded on appeal that it had violated the automatic

stay, but argued that the Brawderses had suffered no damages. The Bankruptcy Appellate Panel reversed.

The Bankruptcy Appellate Panel held that the $12,905 that the County stipulated that it owed the Brawderses for tax overpayments did indeed resolve the issue of how much, but held that the County's appeal was not moot because the stipulation did not resolve the in rem tax liability issue. I think this holding was mistaken. There was no remaining in rem tax liability issue.

True, confirmation of the plan discharged only the Brawderses' personal liability, not the County's lien for whatever taxes were owed.[1] Were there remaining taxes owed, the County could foreclose on its lien after the bankruptcy, or during it, if it obtained relief from the automatic stay, even though it could not obtain judgment against the Brawderses personally. *Johnson v. Home State Bank* holds that bankruptcy discharges the debtor's personal liability but a lienholder retains a right against the security, to foreclose on property to satisfy the debt out of the proceeds.[2] Thus it is usually and correctly said that, with some exceptions, liens "pass through a bankruptcy unaffected."[3]

What matters to this case, though, is not whether the County has or had a lien, but rather the amount of its lien. The Bankruptcy Court did not purport to extinguish the County's continuing lien against the real estate for taxes due. It "revested in the Debtors free of any lien interest held by the County *on account of its prepetition claims*."[4] Arguably, the bankruptcy court's wording inartfully spoke to the County's

---

[1] *See Dewsnup v. Timm*, 502 U.S. 410, 416-17 (1992) *and Johnson v. Home State Bank*, 501 U.S. 78, 82-84 (1991).

[2] *Johnson v. Home State Bank*, 501 U.S. 78, 84 (1991).

[3] *Alan N. Resnick & Henry J. Sommer, Collier on Bankruptcy* § 506.06(1)(a) (15th ed. 2005).

[4] Emphasis added.

lien and not just the amount secured by the lien.[5] But the lien did not matter, because the purported discharge from liens was only for "prepetition claims." Nothing happened to the County's lien for post-petition taxes. Because the County had stipulated that all of its prepetition claims were satisfied, it did not matter whether the lien might in some metaphysical sense survive the bankruptcy. The reason any error in wording did not matter is that, after the stipulation, the lien secured an obligation to pay zero dollars and zero cents. The County stipulated that it owed the Brawderses money for overpaid taxes and the Brawderses did not owe the County a cent. This moots the County's appeal of the decision that its lien for prepetition taxes was erroneously deemed to have been discharged.

The Bankruptcy Appellate Panel goes to some length to avoid the res judicata impact of the confirmation of the plan in the first bankruptcy. This strikes me as problematic, because "[a]n order confirming a Chapter 13 plan is res judicata as to all justiciable issues which were or could have been decided at the confirmation hearing."[6] But I do not think the res judicata issue need even be reached, since the County subsequently stipulated to the amount. The Bankruptcy Appellate Panel's decision ought to be vacated because the case was moot when it was issued.

---

[5]The Bankruptcy Court did not necessarily err. My point is that because of mootness, it does not matter whether it erred.

[6]*Lomas Mortgage USA v. Wiese*, 980 F.2d 1279, 1284 (9th Cir. 1992) (quoted in *In re Ivory (Multnomah County v. Ivory)*, 70 F.3d 73, 75 (9th Cir. 1995).